## John P. Bell v. Dorr E. Felt et al.

1. FRAUD—*Actions Speak as Well as Words.*—Representations may be made by conduct as well as by speech.

2. SAME—*Parties Committing Fraud, Precluded from Deriving Benefit.*—A party committing a fraud is precluded from deriving any benefit from it.

3. SAME—*Parties Contributing to the Misapprehension of Another.* —A person who, by his conduct, contributes to the misapprehension of another, as to a material matter, and intentionally fails to correct such misapprehension, is guilty of a fraud.

4. SAME—*When a Third Person is Particeps Criminis.*—A third person who seeks to derive a benefit from a fraudulent transaction becomes *particeps criminis*, however innocent of the fraud, in its inception, he may have been.

5. SAME—*Payment of Taxes After Rescission for Fraud.*—A party is not bound to pay taxes on property after filing a bill to rescind the contract for fraud.

Bell v. Felt.

6. SAME—*Province of Courts of Equity in Cases of Rescission for Fraud.*—In cases of rescission for fraud a court of equity proceeds upon the principle that as the transactions ought never to have taken place, the parties are to be placed, as far as possible, in the situation in which they would have stood if there had never been any such transactions.

7. SAME—*A Defrauded Vendee Must Do Equity to Entitle Him to Relief.*—To entitle a defrauded vendee to a rescission, he must do equity, but it does not follow that he must be able to return the property in question in the condition in which he received it.

**Bill for Rescission of a Contract of Sale for Fraud.**—Appeal from the Superior Court of Cook County; the Hon. PHILIP STEIN, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1901. Reversed and remanded. Opinion filed May 23, 1902.

**Statement.**—The defendant Dorr E. Felt, obtained from the United States, letters patent, in the year 1888, for an invention known as "The Comptometer." Felt associated with him in business the defendant Robert Tarrant, and thereafter a corporation was organized known as The Felt & Tarrant Manufacturing Company. Subsequently patents for this machine were granted by the Republic of France and the Kingdom of Belgium to Felt and Tarrant and The Felt & Tarrant Manufacturing Company.

The Felt & Tarrant Manufacturing Company engaged in the manufacture and sale of this machine in Chicago, and carried on business under the letters patent granted by the United States. Such business was successful; Tarrant, up to October, 1900, having invested therein the sum of $50,000, and large profits having been made in the manufacture and sale of such machine, the French and Belgian patents were considered by Felt and Tarrant and the corporation, and were actually, a valuable property at the time of the transfer of such patents to Bell and Mason in May, 1891.

About the beginning of the last named month, the complainant, John P. Bell, met the defendant Parker R. Mason. Bell at this time stated to Mason that he was looking for something to get into, whereupon Mason asked him, if he could mention a good thing, in which there was money, would he, Bell, go into it; to which Bell replied, "I would like to find out what it is." Thereupon an appointment

was made, and the next day Bell and Mason went to the place of business of the defendant company and examined the machine. Bell and Mason, within the space of two weeks, went to the office of the Felt & Tarrant Manufacturing Company a number of times, something like, as Bell testifies, half a dozen; and Mason, Bell not being present, made an arrangement with Felt and Tarrant and The Felt & Tarrant Manufacturing Company for a sale to them, Mason and Bell, of the French and Belgian patents for the sum of $7,000. Mason reported to Bell that he had arranged for the purchase of these patents for $25,000, one-third interest to be conveyed to Bell for one-third of this sum, and a two-thirds interest to be conveyed to Mason for two-thirds of $25,000.

Bell testifies that Tarrant and Felt, before the transfer was made, each told him that the price agreed upon was $25,000. Tarrant and Felt deny this, and each for himself declares that he never had any conversation with Bell as to the price to be paid for patents, but that the arrangement was made with Mason alone, and was for the sum of $7,000.

On the 15th of May, Mason, Bell, De Berard and Felt met by agreement in the office of the Commercial Safety Deposit Vaults, in which vaults Bell had money. At this meeting assignments of two patents by The Felt & Tarrant Manufacturing Company and of two by Felt and Tarrant were made to Mason and Bell. Each of the assignments conveyed to Bell an undivided one-third interest of the patent, and to Mason an undivided two-thirds of the same patent. Two of the assignments were each for the therein expressed consideration of $5,000, and two each for the therein expressed consideration of $10,000, making in all an expressed consideration of $30,000. This sum Tarrant and Felt say was inserted in the assignments at the instance of Mason, who stated that the assignments were to be used in Europe, and he wished to have the entire consideration expressed therein—$30,000.

Upon this morning of May 15th, these four parties, Felt, De Berard, Mason and Bell, met at the office of The Felt &

Tarrant Manufacturing Company, and went from there to the Commercial Safety Deposit Vaults. Before leaving the office of the company Bell executed a note payable to it for $1,333.33, which he left with De Berard, the secretary and bookkeeper of the company. Bell testified:

" Felt handed me the papers, all in a large envelope, and we started out and walked over from Tarrant's place of business to the deposit vaults. After a few moments' conversation in regard to the money, I went into the vaults and got out $7,000 in bills of $1,000 each, and before I had paid my money over, Mason pulled out some money and paid it over to De Berard; he also handed him over some papers. I wanted to see what the papers were; De Berard says, 'That is all right, they are all straight and right; they have been looked over;' and he would not show them to me. Before I paid my money over, 'Now,' says I 'gentlemen, is this straight? is this right?' 'Yes,' says De Berard. I counted out the seven $1,000 bills, and I spoke about a receipt. 'Well,' he says, 'the acknowledgment is stated already in the papers; if we have to give you another receipt, we will have to change those papers.' Of course I, knowing all the men being named in the papers, took it for granted that was all right, and after that we left the office of the safety deposit vault together and walked to the corner of Dearborn and Monroe streets. We separated there; I went north—the other three, Mason, Felt and De Berard, went south."

Bell received at this time the assignments of the patents and some other papers, which he was told pertained to the same thing. De Berard and Felt deny the testimony of Bell as to questions at that time asked by him, to the effect, if everything was right and straight, and the answers he says were thereto made.

De Berard testifies that he drew the assignments in accordance with directions given to him by Mason; that he did at the time of the transfer receive from Bell $7,000 in cash, and his note for $1,333.33; that prior to this time Felt had told him that he had agreed to accept $7,000 for the assignment; that at the time of the assignment he received from Mason $900 in cash and his check for the difference between that sum and $16,666.67. Two or three

days afterward he returned to Mason the check he had received from him, and also the $900 he had received from him; that the $7,000 received from Bell was kept and paid into the company on Tarrant's account; that the total consideration received for all the assignments made by Felt and Tarrant, and by The Felt & Tarrant Manufacturing Company was $7,000 and the Bell note; that at the time of this meeting, May 15, 1891, when the assignments were delivered, nothing was said to the effect that the company would return to Mason the consideration he paid over in the presence of Bell on that date, and that that matter was never, so far as he, De Berard, knows, brought to the attention of Bell in any way; that Felt and Mason fixed the consideration that was to be mentioned, and was mentioned, in the assignments; that prior to the meeting at the safety deposit vaults there had never·been any arrangement with Mason that they were to receive from him the money or check which he handed over, nor any talk that Tarrant and Felt, or the company, or all together, were to get more than $7,000 on the delivery of the assignments; that a few days thereafter Mason came to him, De Berard, and said, "I want my check and my money back," and that he, De Berard, thereupon gave the money and check given by Mason, back to him; that he, De Berard, did this, because he understood "We were entitled to $7,000 only;" that they went to one of the Commercial vaults on that day and expected to receive $7,000 only, altogether; that he was surprised at receiving a note for 1,300 odd dollars, and a check for some $16,000 and $900, in excess of the $7,000 which it had been agreed the assignment should be made for; that he did not offer to return the $900 or either of the notes so given to him; that he was not instructed by the other members of the company to return the money or check given by Mason, but did so on his own motion, and never had any conversation with either member of the company in regard to returning it. That there was really no consideration for the note for $1,333.33 given by Bell; that the company still has that note. Upon the trial the solic-

itor for the company stated that they made no claim on that note, and in open court offered to return it to the complainant, Bell.

De Berard testified that he was surprised at receiving the note given by Bell, but that he did not give any expression to his surprise, because he thought the matter was between Bell and Mason, and he was not interested, and he, "just kept quiet, and that is all."

That Mason did, in the presence of Bell, at the time this assignment was made, hand over $900 in money, and his check for $16,666.67, less the $900, and that a day or two afterward the same were returned to Mason, and that the price agreed upon for the transfer of the assignments was $7,000, and no more, was not denied upon the hearing of the case, and is not now.

Mason in his last illness testified that he did pay for the assignment two-thirds of $25,000, all in cash, except his note for $2,000, which note he afterward paid; and that he received nothing back. Neither Felt nor Tarrant, nor De Berard, nor any one, corroborate Mason in this regard.

Mason had talked with Bell, the complainant, about his, Mason's, going to Europe to dispose of the French and Belgian patents, but as time ran on and he failed to do so and nothing came from the assignments, Bell began to be suspicious, made inquiries concerning Mason's financial condition at the time of the assignments, and came to doubt whether Mason had actually paid over two-thirds of the $25,000, he, Bell, understood the price of the transfer to him and Mason, made. There was some talk on the part of Mason with Felt and Tarrant, and also on the part of Bell, that they should give to The Felt & Tarrant Manufacturing Company an option for a certain time to purchase, or a price at which the company might sell the French and Belgian patents. Felt, during the negotiations for such option, went to Bell's house and told him he had an option on Mason's interest in those patents, and wanted an option on his, Bell's, interest, and if he, Bell, would give him, Felt, an option for six months, he, Felt,

would give Bell his note, and that if he took the patents within six months, he would pay him, Bell, $7,000; to which Bell replied that he wanted his money down right then and there, before he would sign any option or do anything.

During the trial, testimony as to the laws of France and Belgium was introduced, from which it appears that a yearly tax has to be paid in each country upon patents issued thereby, and that it is necessary that the patents should be worked; that is, that if the patentee during two successive years, ceases to work his patent, it will be forfeited unless in some way he justifies his inaction, and that a failure to pay taxes will cause a forfeiture of the patent.

Bell, through the Felt & Tarrant Manufacturing Company, paid taxes for two years. The necessity for such payment and the liability of forfeiture if it were not paid, was suggested by the company and Felt on several occasions.

Mason testified that he paid the taxes up to 1897 or 1898. On cross-examination he was uncertain whether he paid them more than for six or seven years after he purchased; finally he thinks it was for about six years that he paid them. There was no evidence that either the French or Belgian Government had taken any steps toward the forfeiture of any of these patents. It was admitted that no taxes had been paid since the beginning of the present suit, the bill in which was filed May 13, 1896.

May 15, 1894, complainant's attorney, Mr. Wilbur, wrote to Mr. Tarrant to the effect that unless some settlement was made with Bell, a suit to set aside the assignment on account of fraud, and for the return to Bell of the money paid by him, would be commenced.

Bell testified that until he heard the testimony of De Berard upon the hearing of this case, he did not know what fraud had been practiced upon him, or that Mason had not paid for the assignments the sum of money it was understood with him, Bell, he, Mason, was to pay; that in fact he had long suspected this, but had never known it until he listened to the testimony of De Berard in this case.

Before entering the decree the court delivered two

opinions, from which it would seem that the action of the court in dismissing complainant's bill, was based upon the conclusion that under the French and Belgian laws, the patents had been forfeited for failure to pay taxes, and that as the patents were admittedly valuable at the time of the transfer, the defendants could not be placed *in status quo;* that is, the complainant could not restore to them the patents in the condition in which they were when assigned, and could not therefore rescind the contract, and hence, could not have relief in a court of equity.

WILLIAM P. BLACK and GEORGE W. WILBUR, attorneys for appellant.

D. J. & D. J. SCHUYLER, JR., attorneys for appellees.

MR. JUSTICE WATERMAN delivered the opinion of the court.

Appellees urge that whatever deception or fraud may have been practiced upon appellant by Mason, they were neither parties to nor concerned in it; that Mason was never in any way their agent nor did they have knowledge or notice that he intended to practice any fraud upon or in any way deceive appellant; that they did not, nor did any one on their behalf, represent to appellant that the price of the patents was $25,000.

We can readily understand how appellant, being told by Mason that the purchase price was $25,000, and acting under this belief, can have honestly come to think that Felt and Tarrant so told him; while it seems impossible that if they did so state, either of them can have forgotten the utterance of such a falsehood. We therefore should, upon the testimony of Bell, Tarrant and Felt, alone, be inclined to believe that appellant is mistaken in this regard. Treating, therefore, the testimony of Felt and Tarrant as the true version of this affair, what is the position of the parties? Was their conduct such as to make them parties to the fraud?

Appellees knew that the contract price was $7,000 cash; that this had been agreed upon between them and Mason;

that Mason acted for himself and appellant.  When at the factory, before going to the deposit vaults, appellant gave to them his note for $1,333.33; they had notice that Bell did not understand what the real bargain was, and the retention of such note, as well as other undisputed proceedings, tend to establish that they were aware that Bell was being deceived and defrauded by Mason.

Arrived at the deposit vaults, appellant handed to them $7,000 in cash, the entire consideration; they not only make no comment upon his overpayment of $1,333.33 by way of his note, but received in his presence $900 from Mason and his check for $15,766.67, making no comment, evincing no surprise; as De Berard said, "Just kept quiet, that is all." $25,000 instead of the expected $7,000 thus received, the parties separated, Mason, Felt and De Berard going in one direction, Bell in another.

Representations may be made by conduct as well as by speech.  Words could not have more clearly conveyed to Bell the understanding that Mason had paid $16,666.67 for his two-thirds; Bell knew that he had given $7,000 cash and his note for $1,333.33.  Appellees knew that they were receiving from Bell seven one thousand dollar bills upon the understanding by him that the purchase was $25,000 and that of this Mason had paid $16,666.67.  As rational men they can not have failed to know that appellant, if he knew the truth, would not give to them this $7,000 and his note for $1,333.33.

It may be that appellees considered the fraud practiced by Mason upon Bell none of their affair; that it was enough for them that they said nothing.  As a rule, at the time of action men feel that existing conditions justify what they then do.  The effort of civilization is not to create conscience but to enlarge its scope; to make its influence ever present; that it be more than retrospective.  The law imposes obligations neither felt by actors in the heat of conduct nor necessarily in hours of reflection.

True it is, as is urged, that Mason did, in the negotiations, act as an agent of Bell, that is, he acted for himself and appellant; nevertheless, appellees can not take advantage of

Bell v. Felt.

a fraud practiced by Mason.   Not only is a party committing a fraud precluded from deriving any benefit therefrom but so is every person, unless he has innocently acquired a subsequent interest.   Story's Eq. Jurisprudence, Sec. 193a.

The case under consideration is not of a concealment or misrepresentation as to the character of the thing sold.  The rule as to the silence which a vendor or vendee may observe in respect to the value, situation or nature of an object of sale has little application here.  The question here is rather to what extent did the vendors conceal their knowledge of the fraud practiced by Mason?  How far did they assist therein?  To what extent have they profited thereby?  Under what obligation were they to disclose the truth to Bell?  Were they justified in the *suppressio veri* they maintained?

A person who, by conduct, contributes to the misapprehension of another as to a material matter, and intentionally fails to correct the misapprehension, is guilty of a fraud.  Vol. 14, p. 74, Second Ed. Am. & Eng. Ency. of Law; Mitchell v. McDougall, 62 Ill. 498–501; Endsley v. Johns, 120 Ill. 469–479; Kenner v. Harding, 85 Ill. 264–274; Fitzsimmons v. Joslin, 21 Vt. 129; Yeoman v. Lasley, 40 Ohio St. 190; DeWitt v. Van Sickle, 29 N. J. Eq. 209–215.

The amount agreed to be, as well as that actually paid for the patents, was material to Bell; not only as determining his obligation to the vendors and to Mason, but as tending to show the actual value of the thing purchased.  The amount agreed to by the vendors and Mason was $7,000; of this Bell's part was $2,333.33; Mason's $4,666.66.  This the vendors knew; nevertheless they received from Bell his

note for .................................... $1,333.33
and cash.................................... 7,000.00
                                            _____
                                             $8,333.33

and in his presence went through the form and pretense of receiving from Mason cash. ................... $   900.00
Check for.................................... 15,766.66
                                            _____
                                            $16,666.66

returning the same to him two or three days thereafter.
They kept the note of Bell and some two years after its
reception, offered to give it to him in exchange for an option
to purchase back the patents; finally, during the trial of this
cause, disclaiming all right thereto and offering to surren-
der the same.   They not only thus actively aided Mason in
the perpetration of a fraud but participated in the benefits
thereof.

A third person, who, knowing thereof, seeks to derive ben-
efit from a fraudulent transaction, becomes *particeps crim-
inis*, however innocent of the fraud in its inception he may
have been.   Story's Eq. Jurisprudence, Sec. 193a.

Nor does the law permit one to assist in the cheating of
another.    Barker & Gay Furniture Company v. Theim,
Supreme Court of Illinois, opinion filed April 16, 1902;
Beidler v. Crane, 135 Ill. 92, 100, 101; same v. same, 22 Ill.
App. 538; Green v. Tatum, 19 N. J. Eq. 105–110.

Was appellant when he began this suit entitled to rescind ?

While for some time prior to the filing of his bill, Bell
had entertained a strong suspicion that Mason had not paid
to the vendors two-thirds of $25,000, he had never been so
informed nor in possession of any evidence so showing.
Mason, in this case, called by the defendants, testified that
there was no fraud and that he had paid $16,666.66 and
received nothing back.   Only when DeBerard testified did
appellant learn that he had been defrauded as he had before
conjectured.   (See Veazie v. Williams, 8 Howard (U. S.), Cur-
tis' Ed., 527–535.)   Appellant has in no manner transferred
aught of that he received.   If the evidence establishes that
the patents have, under the laws of France and Belgium,
been forfeited, it is not because of action on his part, but
perforce of non-action by some one.

Appellant was not bound to pay taxes or work the pat-
ents after the filing of his bill for rescission.   (Bigelow on
Fraud, Vol. 1, p. 430; Kerr on Fraud, 337.)   He has never
received anything from or on account of the patents; nor
does it appear that he could have ever done anything by
which he could have obtained aught therefrom; although
he might have given appellees an option to purchase.

Bell v. Felt.

What is contended by the vendors in effect is, that, having been induced by fraud to pay the entire purchase price for one-third of such entirety, appellant can not rescind unless he or some one has advanced money to keep from forfeiture, not merely the one-third he received, but the two-thirds never conveyed to him.   See Hegenmeyer v. Marks, 37 Minn. 6.

The preponderance of the evidence is to the effect that the taxes had been paid up to the filing of the bill.   March 15, 1894, appellant, upon his mere conjecture as to the perpetration of a fraud upon him, caused to be written to the vendors a letter demanding a settlement and threatening to begin suit to set aside the assignments on the ground of fraud.   So far as appears, there was then ample opportunity for the vendors to have protected these patents and their right in them.

In Maurin v. Tredinnick, 12th Weekly Reporter, 740, the vice-chancellor, in reference to the rescission of a sale of stock forfeited after sale, because of non-payment of calls, said:

" The plaintiff, seeking to set aside a sale of property of a perishable nature, was not bound to preserve the property *in statu quo* till the hearing.   His only duty was to do nothing with the property after the bill was filed, and in cases where damage was likely to occur, and might be prevented, a plaintiff ought, perhaps, to give intimation to the defendant, leaving him to do what he pleased."

" The letter of March 12th was admissible as evidence in an inquiry under what circumstances the shares were forfeited, for it went to show why the plaintiff did not pay the calls—viz., because he was about to assert his equitable rights."

In cases of rescission for fraud a court of equity proceeds upon the principle that as the transaction ought never to have taken place, the parties are to be placed as far as possible in the situation in which they would have stood if there had never been any such transaction.   The court will not concern itself nicely as to adjusting the equities of those guilty of the fraud.   Neblett v. McFarland, 92 U. S. 101, 103, 105; Scott v. Perrin, 4 Bibb, 360; Van Dyke v. Walters, 88 Ill. 444–446; Masson v. Bovet, 1 Denio (N. Y.) 69.

To entitle a defrauded vendee to rescission he must do equity, but it does not follow that he must be able to return the property in the condition in which he received it. Masson v. Bovet, 1 Denio, 69; Neblett v. McFarland, 92 U. S. 101, 103; Hegenmeyer v. Marks, 37 Minn. 6; Guckenheimer v. Angevine, 81 N. Y. 394.

In Neblett v. MacFarland, *supra*, the Supreme Court of the United States in affirming a decree for rescission, said:

"Parties engaged in a fraudulent attempt to obtain a neighbor's property are not the object of the special solicitude of the courts. If they are caught in their own toils, and are themselves the sufferers, it is a legitimate consequence of their violation of the rules of law and morality. Those who violate these laws must suffer the penalty."

To the same effect is Blake v. Mowatt, 21 Beav. 603, 613.

It was open to the vendors as well as to appellant to have kept the taxes on these patents paid. The vendors knew the facts as to the sale; appellant did not. Before any forfeiture had taken place they were charged by him with fraud and rescission demanded. He offers to and can return all that he received; if the patents are not now what they were when he was, by the conduct of his vendors, defrauded, the present situation is the result of the fraud to which they were parties and from which they received benefit.

The decree of the Superior Court is reversed and the cause remanded, with directions to enter a personal decree in favor of complainant against Tarrant, Felt and The Felt & Tarrant Manufacturing Company for $7,000, and a decree that the assignments of the Belgian and French patents made by Felt, Tarrant and The Felt & Tarrant Manufacturing Company to Bell and Mason, and the note by Bell made for $1,333.33 be set aside and forever held for naught, and that all assignment, patent and other papers received by Mason and Bell from Felt, Tarrant and The Felt & Tarrant Manufacturing Company be surrendered and delivered up to Felt, Tarrant and The Felt & Tarrant Manufacturing Company.

Reversed and remanded, with directions.