HERBERT J. SHANAHAN, Plaintiff-Appellant, *v.* WILLIAM E. SCHINDLER, Defendant-Appellee.

First District (5th Division)    No. 77-1183

Opinion filed July 21, 1978.

Hoffman & Davis, of Chicago (Maurice L. Davis, of counsel), for appellant.

Martin C. Ashman, of Chicago (William J. Harte, of counsel), for appellee.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Plaintiff, Herbert J. Shanahan, brought this action against defendant, William E. Schindler, to recover the sum remaining unpaid upon a promissory note. Judgment was entered by confession; however, defendant filed a timely motion to open the judgment. The court subsequently granted defendant leave to appear and defend, with the judgment by confession standing as security. A trial was then had before the court, without a jury, resulting in a judgment for defendant. It is from this judgment that plaintiff appeals.

We affirm. The following facts, upon which the parties essentially agree, have been gleaned from the record and illustrate the circumstances out of which the present action arose.

The note involved in this case is a "replacement" or "substitute" for a note signed in connection with a 1968 sale of stock transaction. At that time both plaintiff and defendant were officers of the Western Transportation Company (Western). Shanahan was president of Western, and Schindler was its secretary and treasurer. James Gottlieb was Western's chairman of the board, as well as its sole shareholder.

Some 15 corporations were affiliated with Western, serving as operating companies, real estate holding companies, and equipment companies. Shanahan, Schindler, and Gottlieb all held shares in various of these companies; however, of import to this case are the facts concerning one particular affiliate, General Leasing Company (General Leasing). When General Leasing was incorporated Gottlieb held 75% of the shares and Shanahan held 25%. In 1967 General Leasing redeemed all of Gottlieb's shares for $1,100,000, thus leaving plaintiff as its sole shareholder.

Early in 1968, Gottlieb and Schindler entered into negotiations with Continental Connector Corporation (Continental) for the exchange of all the shares of Western and its affiliates in return for shares of Continental. Since Gottlieb held all of Western's shares, as well as substantial interests in many of its affiliated companies, his was by far the major interest in the proposed exchange of shares with Continental. However, the transaction could not be completed without all the shares of Western and its affiliates. Shanahan refused to participate in the exchange transaction.

At this point, defendant's and plaintiff's versions of the events that occurred differ substantially. Schindler's affidavit in support of his motion to open the judgment states that Shanahan's position made it necessary for Gottlieb to purchase Shanahan's stock in General Leasing, and that these two agreed "that said stock would be acquired by James Gottlieb for the amount of $415,000." The affidavit avers that

"[a] hindrance to said transaction, however, was that if James Gottlieb would acquire the stock of General Leasing Company said James Gottlieb would have been liable to pay large and substantial amounts of income tax to the Internal Revenue Service of the United States because said James Gottlieb had previously owned said shares and had sold said shares to the General Leasing Company within ten (10) years of the proposed transaction."

In order to overcome this problem Gottlieb and Shanahan arranged a plan whereby Schindler would act as Gottlieb's nominee in the purchase, and plaintiff would receive an additional $128,500 for his participation in the scheme. Both men assured Schindler that he would incur no personal liability on the purchase note; that Shanahan would look to Gottlieb for payment, and that Gottlieb would actually pay the purchase price.

In addition, the affidavit states that following Gottlieb's death in 1972, and within the time for filing claims on his estate, Shanahan orally agreed to release and cancel the note. These averments, which Shanahan denied in his counteraffidavit, form the basis for Schindler's proffered defenses of (1) lack of consideration, (2) illegality, (3) fraud, and (4) oral release of the note.

At trial, Schindler testified that he had been associated with Western in various capacities since 1952. In 1968 he participated in perhaps 15 meetings with the principals of Continental or their lawyers, negotiating the terms of the proposed stock exchange transaction. He kept Shanahan informed of the gist of these negotiations.

In view of Shanahan's refusal to participate in the transaction, several conversations occurred concerning the purchase of Shanahan's various interests. Gottlieb told Schindler that he had offered Shanahan $750,000, and then $850,000 for his interests. Subsequently, in the presence of Shanahan, Gottlieb told Schindler that an agreement had been reached for $1,000,000. However, Schindler was then told that if Gottlieb bought all of Shanahan's stock in the various companies, it would have substantial tax consequences which could have serious effects on the whole reorganization of the companies involved. Gottlieb then asked Schindler to help him out by taking the shares in General Leasing, and Schindler responded that he did not have that kind of money. Gottlieb said, "Don't worry about the money. I will furnish you the money."

Schindler testified that he then started to tell Gottlieb that such a guarantee was inadequate. However, Shanahan interrupted him and said, "Don't worry about it. There won't be any liability on your part, because Gottlieb is going to furnish the money for it." On this basis Schindler agreed to purchase the General Leasing stock.

Approximately two days later Schindler was again called into a meeting with Gottlieb and Shanahan. He was informed that the total purchase price for all of Shanahan's interests was now $1,089,000 and that he would

still have to take the General Leasing stock for Gottlieb. Schindler stated that he could only do so if Gottlieb furnished the money and if plaintiff agreed there would be no liability on Schindler's part. Otherwise he could not do it because he did not have the means. Shanahan said, "That's exactly what it is going to be."

On July 22, 1968, Schindler and Shanahan executed an agreement for the sale of the outstanding stock of General Leasing to Schindler at a price of $544,500. The agreement provided for payment to Shanahan of $140,000 at closing and delivery of Schindler's promissory installment note for $404,500, to be secured by a pledge of the General Leasing stock and deposit of the pledged stock in escrow with the Central National Bank of Chicago. The sale was consummated on these terms on that same day.

Also on July 22, 1968, Shanahan and Gottlieb entered similar agreements for the sale of Shanahan's shares in the other Western affiliates. The total price to be paid under these agreements also amounted to $544,500, with $140,000 being paid at closing and the remainder due under Gottlieb's promissory installment notes.

The $140,000 paid by Schindler at closing was furnished to him through a bank loan arranged by Gottlieb. Similarly, the money used to meet the installment payments of principal and interest was supplied to Schindler by Gottlieb. Gottlieb gave the money to Schindler, who deposited it in his own account, and then drew on it by check to pay Shanahan.

Schindler stated that a February 5, 1972, letter from Gottlieb accurately set out the terms of the 1968 transaction. Schindler had given this letter to the Internal Revenue Service in connection with inquiries made concerning the transaction. The letter states in part:

> "In view of Herb's refusal to go along with the proposed exchange offered by Continental Connector Corporation, the only way that exchange could be kept alive and feasible of completion was to purchase the shares in these affiliates from Herb and his wife.

> Accordingly, you [Schindler] agreed to purchase from Herb his shares in General Leasing Company for $544,500.00 and I agreed to buy from Herb his 25% interest in the above named five terminal companies for $217,800.00; and I agreed also to buy from Herb and his wife, Hazel, all of the shares of Mikat, Inc. for an additional $326,700.00.

> These transactions contemplated that each of us would pay $140,000.00 in cash on our respective purchase prices and the balance of the purchase price by our promissory notes, each secured by the respective shares of the companies we were buying

with the right to substitute Continental Connector Corporation shares therefor as collateral when the contemplated exchange with Continental Connector Corporation was completed.

I arranged for each of us to borrow on his personal note $140,000.00 from Central National Bank in Chicago for these downpayments under an arrangement whereby each of us collateralized his own note with the stock being acquired, such collateral also securing the other's note on a cross collateral arrangement.

If you would agree to undertake the purchase of Herb's shares in General Leasing Company, I agreed to advance you from time to time without interest all amounts necessary for the making of the principal and interest payments to Herb Shanahan pursuant to your promissory note given to him in that connection, all upon the understanding that you would only be required to repay to me the amount I was so to advance to you from time to time for the making of your installment payments on your note to Herb out of the net proceeds, after all expenses of sale, received by you from the eventual sale by you of the Continental Connector Corporation preferred shares which you were to receive in exchange for your General Leasing shares (or the common shares of Continental Connector Corporation received by you upon conversion of such preferred shares) to the extent such net proceeds exceed the sum of $140,000.00, plus the unpaid balance under your promissory note to Herb Shanahan.

You agreed to leave with Central National Bank in Chicago, as collateral to our respective notes of $140,000.00 each at that bank until those two notes were paid, all of the Continental Connector Corporation shares, preferred or common, which you were to receive in exchange for your General Leasing Company shares as such shares were released to you under your purchase contract with Herb Shanahan."

Schindler made payments on his note with the money furnished by Gottlieb until the balance was reduced to $224,500.

In 1971 Schindler contacted Shanahan concerning a revision of the 1968 notes signed by himself and Gottlieb. Shanahan agreed to a proposed reduction in the amount due in each monthly payment and told Schindler to arrange it with his lawyer. As a result, Schindler signed a promissory note for $224,500, in substitution and cancellation of the original note for $404,500. This is the note sued upon in the present action. Schindler kept

making payments on the note until Gottlieb died on April 22, 1972. Thereafter, he made one last payment of $5000, for which he had to borrow funds from one of Continental's subsidiaries. This payment reduced the amount due on the note to $165,028.13. Schindler testified that he did not have the means to continue payments on the note by himself after Gottlieb's death.

As permitted under the 1968 agreement, preferred shares of Continental had been substituted for the General Leasing shares deposited in escrow. These preferred shares were convertible to common shares, on the basis of three common shares for one preferred share, over a four-year period. On December 7, 1970, Schindler had directed a letter to the escrowee to transmit 303 preferred shares for conversion to common shares. On November 16, 1971, he directed the escrowee to transmit 834 preferred shares for conversion to common shares. Finally, on November 16, 1972, Schindler again directed that 834 preferred shares be converted to common shares. Following the last of these conversions, there remained on deposit with the escrowee 4698 common shares of Continental in the name of Schindler.

Schindler further testified that he never considered himself to be the owner of the stock obtained, and held in escrow, pursuant to the General Leasing transaction. He also reiterated that the February 5, 1972, letter accurately set out the terms of the 1968 transaction. He classified the money given him by Gottlieb to make the payments as constituting loans.

Gottlieb had also loaned Schindler the money to purchase stock in another Western affiliate prior to the exchange with Continental. This loan, for $55,000, was on terms similar to those concerning the Shanahan loans. The February 5, 1972, letter from Gottlieb refers to this second transaction as follows:

> "As to the $55,000.00 which I loaned to you without interest for your purchase from John Cerney and Jeannine Cerney of the shares of J & J Corporation, you agreed to include that company's shares in the proposed exchange with Continental Connector Corporation and you also agreed to put up the Continental Connector Corporation shares you were to receive in exchange for your J & J shares as collateral to our respective notes of $140,000.00 with the Central National Bank in Chicago; and I agreed that you would only be required to repay such $55,000.00 to me out of the net proceeds you would thereafter receive from the sale of such Continental Connector Corporation shares so to be received by you in exchange for your J & J shares."

Schindler indicated that he considered himself, and not Gottlieb, to be the owner of the J & J stock after this transaction.

Schindler admitted that from 1971 through 1976 he reflected as income

on his Federal tax returns the dividends paid by Continental upon the shares held in escrow. These dividends were deposited to his personal account. In his deposition Schindler claimed that he took these dividends because no one made a demand on him for them. Similarly, Schindler also took as tax deductions the interest he paid Shanahan on these notes.

Concerning his allegations that Shanahan was to receive a $128,500 bonus for participating in a scheme to evade taxes, Schindler admitted that there had been no conversations where Shanahan and Gottlieb had mentioned such a figure. There was never any discussion that Gottlieb would purchase the stock for $415,000. Gottlieb directed the allocation of price to the General Leasing stock by halving the total purchase price. Shanahan was not present when this allocation of price occurred. However, Schindler indicated that the book value for Shanahan's General Leasing stock was $415,000, and that the "bonus" alleged in his affidavit was figured by subtracting this amount from the total purchase price for the stock.

Schindler also claimed that in November or December of 1972 he spoke with Shanahan on the phone. During this conversation Schindler reminded plaintiff of his original promise not to look to defendant for payment. Shanahan responded by saying he remembered the understanding very well, and that he considered the note cancelled. The question of Shanahan's filing a claim against Gottlieb's estate in connection with this note was raised, and Shanahan indicated that he would discuss it with his lawyer. Schindler himself, although named a co-executor in Gottlieb's will, never filed a claim in the estate as to this note.

Shanahan testified that he had first become associated with Western, and James Gottlieb, in 1946. In 1968, he was aware that Schindler's annual income from Western and its affiliates was approximately $52,000. He first learned of the proposed deal with Continental by reading about it in a Wall Street Journal press release given him by Gottlieb in March of 1968. When discussions finally occurred between the parties concerning the exchange of shares, Shanahan stated that he would have no part of the transaction. Shanahan never discussed the price of his interests in various companies with Schindler. He had two such discussions, however, with Gottlieb. The first occurred when he called Gottlieb in Las Vegas and told him that, for all his various interests, he would need $1,000,000 because he intended to retire after 1968 and he wanted no part of the Continental stock. If the deal was not going to be cash then Shanahan wanted $1,089,000 for his interests. Shanahan testified that while he cared who would become obligated to him in any noncash sale of his interests, he left the negotiations and arrangements of that kind in the hands of his attorney.

After Gottlieb told Shanahan that he would buy his shares, Schindler

then informed him that, as Gottlieb had to get "approval" of the Internal Revenue Service, he (Schindler) was going to buy the General Leasing stock. It was not important to Shanahan who became obligated to him on the note so long as his lawyer approved him. It was the lawyer's job to determine if a party could pay. Shanahan would have agreed to let defense counsel's secretary, who made $10,000 per year, sign the note if his lawyer had approved her as being able to make the payments and pay it off. He was not curious as to how Schindler could pay off a note calling for monthly payments of $7500 when his annual income was only $52,000. Shanahan had no way of knowing what Schindler's earnings might be outside of his salary from Western. He had seen no credit report on Schindler. He never told Schindler that he would incur no liability on his purchase of the General Leasing stock because he (Shanahan) would look to Gottlieb for payment of the note.

Shanahan denied that Schindler had spoken with him in December of 1972 concerning the release and cancellation of the note. He filed no claim on Gottlieb's estate in connection with this note, although he did file such claims as regards the notes signed by Gottlieb for the 1968 purchase of his stock in the other Western affiliates.

The trial judge delivered an extended oral opinion. He concluded that Shanahan's monumental indifference to his own serious and substantial financial affairs, evidenced by his willingness to let anyone approved by his attorney sign the note, only becomes believable if Shanahan had another agreement with a "person of substance who was obviously able to make the payments." The court concluded that the only reasonable inference to be drawn from the record was that Shanahan was a shrewd businessman who pressed his advantage when Gottlieb became "frantic" to make the Continental deal. However, tax problems arose with the purchase of the General Leasing stock, so Gottlieb, Shanahan, and Schindler all agreed that in order to fool and deceive the Internal Revenue Service, Schindler would purport to become the buyer of this stock. However, the court concluded that Gottlieb was in fact the real purchaser.

The court also reasoned that once the parties started upon such a scheme, they had to continue the scheme in order to "fool" the Internal Revenue Service. Thus, all the documents in the case appear legitimate and proper. Thus, too, the February 5, 1972, letter appears to outline a legitimate loan transaction between Gottlieb and Schindler. However, the court believed that "the letter was written for the purpose of continuing to fool the I.R.S."

The court concluded that following Gottlieb's death both plaintiff and defendant faced problems. Schindler's problem was that he could not meet the payments on the note, and he "doesn't know whether his long

time associate [Shanahan] will live up to his secret verbal agreement or whether he is going to try and stick him on the note." Shanahan's problems were that: (1) he knew that the Continental stock in escrow had been declining in value; (2) he could not file a claim on Gottlieb's estate with no evidence of Gottlieb's obligation on this note; (3) if he filed such a claim he "gives the game away" and would be subject to "embarrassing inquiries" from the Internal Revenue Service.

The court stated that the dividend checks taken by Schindler on the escrowed stock in fact belonged to Gottlieb when he lived, and to Gottlieb's estate after his death. However, Schindler could not put this money into the estate without attracting the attention of the Internal Revenue Service, and "then the whole matter would have come to light."

OPINION

■■    The record is clear in this case that the trial court based its ruling upon the defense of illegality. The court found that Gottlieb, Shanahan, and Schindler all participated in a scheme to evade taxes and deceive the Internal Revenue Service by having Schindler act as a secret "strawman" through whom Gottlieb could purchase the General Leasing stock from Shanahan. The rule is that a contract designed to accomplish an unlawful purpose is illegal and void, and the court will aid neither party in its enforcement. (See *Merchandise National Bank v. Kolber* (1977), 50 Ill. App. 3d 365, 365 N.E.2d 688.) Therefore, the court found in favor of defendant.

Plaintiff, however, strenuously objects that the evidence does not support the court's conclusion that this transaction had an unlawful purpose. He points to the fact that all the evidence adduced is consistent with the idea that this transaction was accomplished through a legitimate loan agreement between Schindler and Gottlieb, making Schindler the actual purchaser of the stock. More particularly, he points to the fact that Schindler's actions subsequent to 1968 were those of an owner, and not of a mere nominee or agent.

■■■    We agree with plaintiff that the trial court's conclusion was in error. Where, as in this case, a contract appears innocent on its face, a presumption of legality obtains. (See 17 Am. Jur. 2d *Contracts* §238 (1964); 12 Ill. L. & Prac. *Contracts* §201 (1955).) The burden of proof was on defendant to show by clear and convincing evidence that this transaction was illegal. (See *Meyer v. Buckman* (1955), 7 Ill. App. 2d 385, 129 N.E.2d 603; *Huff v. Fulk* (1948), 334 Ill. App. 33, 78 N.E.2d 328.) We do not believe that such a showing was made in the instant case. The evidence relied upon by the court (*i.e.,* that Shanahan knew Gottlieb would be providing the money) is not inconsistent with the presumed legality of this transaction. Schindler, himself, never testified that he was

asked to act as an agent or nominee. While he never considered himself to be the owner of the stock, Schindler's subsequent actions (*i.e.*, taking the interest payments as income tax deductions) were not those of a nominee. A holding that such actions, as well as other evidence (*i.e.*, Gottlieb's February 5, 1972, letter to Schindler), were merely part of a "coverup" scheme would be based largely on suspicion. The is not permissible. See *Huff v. Fulk.*

However, we find it unnecessary to discuss in further detail our reasons for rejecting the trial court's conclusion regarding the defense of illegality. In our view the record adequately supports defendant's claim of fraud and misrepresentation and thus the trial court's judgment in his favor must be affirmed. The rule is that a reviewing court can affirm a judgment of the trial court where it is justified in law for any reason or ground appearing in the record. *Third Swansea Properties, Inc. v. Ockerlund Construction Co.* (1976), 41 Ill. App. 3d 894, 354 N.E.2d 148.

Schindler contended in the trial court, and again before this court, that he was induced to enter this transaction by Shanahan's promise that he would not be held liable on the note. He testified that he told Gottlieb and Shanahan that he did not have the kind of money needed to purchase the General Leasing stock. Gottlieb assured him that he would provide the money; however, this guarantee was not sufficient until Shanahan added that he would not hold Schindler liable on the note. Shanahan told Schindler that he would only look to Gottlieb for payment of the purchase price.

While Shanahan denied making any such assurances, the record reflects that the court believed Schindler's version of these events. The court stated during its oral pronouncement that Schindler faced a problem after Gottlieb's death in that he did not know whether Shanahan would abide by his promise, or whether he would try and "stick" Schindler on the note. Clearly then, the court believed that Shanahan had in fact assured Schindler that no liability would accrue to him as a result of this note.

In nonjury cases the credibility of the witnesses and the weight afforded their testimony are questions to be determined by the trial court. (*Geist v. Lehmann* (1974), 19 Ill. App. 3d 557, 312 N.E.2d 42; *Unger v. Metropolitan Life Insurance Co.* (1968), 103 Ill. App. 2d 150, 242 N.E.2d 907.) A reviewing court will not substitute its judgment as to credibility of witnesses unless the findings of the trial court are against the manifest weight of the evidence. *Brown v. Zimmerman* (1959), 18 Ill. 2d 94, 163 N.E.2d 518; *Rhodes v. Sigler* (1975), 27 Ill. App. 3d 1, 325 N.E.2d 381.

In this case we cannot conclude that the court erred as against the manifest weight of the evidence in choosing to believe Schindler's account of how he was induced to enter this transaction. The record reflected that Schindler did not possess assets enough to be able to

purchase stock for over one-half million dollars. The payments to Shanahan on the 1968 note were $7500 per month, yet Schindler only earned approximately $52,000 per year. Even with a guarantee of money from Gottlieb, it is reasonable to infer that Schindler would not enter this contract without assurances of nonliability from Shanahan. As long as Shanahan was willing to look to Gottlieb, or the escrowed stock, for satisfaction of the note then Schindler could risk taking on such a large obligation. This is entirely consistent with Schindler's later failure to file a claim on Gottlieb's estate. If he had feared being personally liable on the note then he could have filed such a claim based on the February 5, 1972, letter.

Likewise, it is reasonable to infer, as the trial court did, that Shanahan was too experienced a businessman to be nonchalant about such a large transaction, unless he knew that Gottlieb was going to furnish the money to Schindler. He could then rely on Gottlieb, plus the pledged stock in escrow, to underly the note. This too is consistent with Shanahan's failure to file a claim on Gottlieb's estate in 1972. Rather than possibly file a third-party beneficiary claim he could, as the trial court noted, wait and see if the escrowed stock increased in value. Only when that stock failed to appreciate enough did he find it necessary to file suit on the note, which had been in default for almost four years.

■■  Where several reasonable inferences are possible from conflicting testimony, a reviewing court must accept those which support the trial court's judgment. (See *Rhodes v. Sigler.*) Thus, in light of the record, and the foregoing inferences therefrom, we cannot say that the trial court erred in believing that Shanahan made a promise to Schindler of nonliability on this note.

Plaintiff argues in response that even if such a promise was made, it is not the type of representation which may legally constitute "fraud and misrepresentation." We disagree.

■■  In order to constitute fraud invalidating a contract, a representation must be one of material fact, made for the purpose of inducing the other party to act; known to be false by the maker, but reasonably believed true by the other party, and upon which he relies and acts to his damage. (*Roda v. Berko* (1948), 401 Ill. 335, 81 N.E.2d 912; *Zaborowski v. Hoffman Rosner Corp.* (1976), 43 Ill. App. 3d 21, 356 N.E.2d 653.) Generally, a false representation of intention or future conduct is not sufficient to constitute a fraud in law. (*Roda v. Berko; Luttrell v. Wyatt* (1922), 305 Ill. 274, 137 N.E. 95.) However, an exception to this rule is stated in *Roda v. Berko*:

> "* * * in cases where the false promise or representation of intention or of future conduct is the scheme or device to accomplish the fraud and thereby cheat and defraud another of his

property, equity will right the wrong by restoring the parties to the positions they occupied before the fraud was committed." 401 Ill. 335, 340, 81 N.E.2d 912, 915.

■■ We believe that the testimony of Schindler, as accepted by the trial court, reflects such a total scheme or device to defraud. (See *Roda v. Berko; Bresler Ice Cream Co. v. Millionaires Club, Inc.* (1966), 71 Ill. App. 2d 342, 218 N.E.2d 891.) The facts of this case adequately set out a good defense of fraud. While Shanahan denied making a promise of nonliability, the trial court believed otherwise, and his denial of this fact may be construed to reflect that he did not intend to keep his promise if it proved necessary to sue. His subsequent actions bear out such an intent. That Schindler, in turn, relied on this promise to his detriment cannot be doubted. Thus, the contract is voidable at Schindler's option. *Roda v. Berko; Bresler Ice Cream Co. v. Millionaires Club, Inc.*

Plaintiff also contends, however, that the issue of fraud is not material to the instant case. He points out that the note sued on is not the $404,500 note given in 1968, but the note for $224,500 dated December 1, 1970, and delivered pursuant to a March 16, 1971, agreement. Plaintiff argues that no representations of nonliability were made when this second note was executed and therefore no defense of fraud exists. We disagree.

■■ The December 1970 note represents the very same obligation as the 1968 note. The only modification sought concerned a reduction of the monthly payments to be made. We believe that under such circumstances it is reasonable to construe the second note as also being premised upon plaintiff's promise of nonliability. It is true that one may waive a defense of fraud by entering a new contract; however, knowledge of the fraud at the time of signing the substitute note is a prerequisite to such waiver. (See 17 Am. Jur. 2d *Contracts* §151 (1964); 37 Am. Jur. 2d *Fraud and Deceit* §397 (1968).) The representation in this case was of a continuing character, and defendant was entitled to rely upon it until informed otherwise. See 37 Am. Jur. 2d *Fraud and Deceit* §242 (1968).

■■ To hold otherwise in this case would establish a precedent whereby a party, who fraudulently induces one to enter a contract, could eliminate the defense of fraud by merely managing to execute a substitute contract, with some modified terms, without disclosing the original fraud. Such a result would clearly be contrary to the established principle that a party committing fraud should be precluded from benefiting therefrom. See *Bell v. Felt* (1902), 102 Ill. App. 218, *modified*, 205 Ill. 213, 68 N.E. 794. (1903).

■■ Lastly, plaintiff argues that the evidence of fraud in the instant case was improperly admitted by the trial court. Specifically, he claims that the court erred in overruling his objections to Schindler's testimony concerning the promise of nonliability, on the basis of the parol evidence

rule. Once again, we must disagree. The law is clear that parol evidence is admissible to show that a written instrument has been procured by fraud. See *Giberson v. Moore* (1962), 35 Ill. App. 2d 175, 182 N.E.2d 767; *Spindler v. Krieger* (1958), 16 Ill. App. 2d 131, 147 N.E.2d 457; 17 Am. Jur. 2d *Contracts* §191 (1964); 18 Ill. L. & Prac. *Evidence* §277 (1956).

Therefore, in sum, we conclude that the record in this case adequately supports defendant's claim of fraud, and the trial court's judgment in his favor must be affirmed. In view of this conclusion we find it unnecessary to deal with the remaining issues raised on appeal, relating to defendant's other defenses.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

LORENZ and WILSON, JJ., concur.