**LOVEJOY ELECTRONICS, INC.,
Plaintiff Counterdefendant,**

v.

**Gerald N. O'BERTO, Defendant
Counterplaintiff.**

**No. 84 C 1543.**

United States District Court,
N.D. Illinois, E.D.

Sept. 4, 1985.

---

**9.** It should be recalled that prior to the accident, plaintiff made over thirty trips to Killington to ski.

Kenneth I. Markham, Allan N. Lasky, Lasky Shulman & Goldman, Chicago, Ill., for plaintiff-counterdefendant.

H. Carl Runge, Jr., Runge & Gumbel, P.C., Collinsville, Ill., John H. Morrison, Kirkland & Ellis, Chicago, Ill., for defendant-counterplaintiff.

## MEMORANDUM OPINION

WILL, District Judge.

This case arises from a contractual dispute involving the development and sale of a computer chip known as the "HOHM 8081." In the amended complaint, plaintiff-counterdefendant Lovejoy Electronics, Inc. ("Lovejoy") alleges breach of contract, breach of fiduciary duty, and negligence on the part of defendant-counterplaintiff Gerald N. O'Berto ("O'Berto"). Lovejoy also alleges breach of contract on the part of defendant International Microcircuits, Inc. O'Berto has countered with charges against Lovejoy of breach of contract and fraud.

Before us is Lovejoy's motion for summary judgment on O'Berto's amended counterclaim. For the reasons stated herein, we grant the motion in part and deny it in part. Pursuant to Fed.R.Civ.Pro. 56(d), an order will be entered specifying uncontroverted issues to be "deemed established" for purposes of any further proceedings in this case.

### Japanese Exclusivity Clause

On March 16, 1980, Lovejoy and O'Berto executed a written contract ("Consulting Agreement") under the terms of which O'Berto was to supply, at O'Berto's direct cost of procurement, all Lovejoy's requirements of the HOHM 8081 chip. Consulting Agreement, ¶ 10. In exchange for these sales and O'Berto's consulting services, Lovejoy agreed to make certain royalty payments to O'Berto. *Id.* at ¶ 12(a)–(d). The Consulting Agreement expressly provided that it was to be interpreted in accordance with Illinois law. *Id.* at ¶ 19.

The first question for our consideration is whether O'Berto is precluded, as a matter of law, from recovering for Lovejoy's alleged violation of the Consulting Agreement's "Japanese exclusivity clause." Consulting Agreement, ¶ 13. Under the terms of that clause, O'Berto was to have the exclusive right to market the HOHM 8081 in Japan. Lovejoy appears to concede that, two and one-half months after the Consulting Agreement was executed, Lovejoy granted J.H. Fenner & Co. ("Fenner") a non-exclusive right to sell products embodying the HOHM 8081 in Japan. Despite the apparent conflict between this arrangement ("Fenner Agreement") and the Japanese exclusivity clause of the Consulting Agreement, Lovejoy contends that an action for breach of contract may not be maintained against it because O'Berto cannot prove damages. According to Lovejoy, damages are an essential element of a

breach of contract claim under Illinois law. Lovejoy notes that O'Berto stated in his deposition that he knew of no sales activity by Fenner in Japan and that he himself had taken no affirmative steps to promote new business there. Lovejoy contends that this testimony establishes, as a matter of law, that O'Berto cannot prove damages, and that he therefore cannot recover for breach of contract under Illinois law.

■ It is not necessary for us to discuss the elements of a contract claim under Illinois law because, even assuming that Lovejoy is correct on the law, its approach to summary judgment is wide of the mark. The fact that O'Berto, in his deposition, could point to no specific instances of competition from Fenner does not establish that no such competition in fact took place. At trial, O'Berto may yet be able to prove that Fenner made sales in Japan or that Fenner or Lovejoy interfered in some other fashion with O'Berto's business there. In the absence of any sworn proof inconsistent with his pleadings, O'Berto is not obliged, on an adverse motion for summary judgment, to produce specific evidence in support of his claim for relief. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 156–60, 90 S.Ct. 1598, 1607–10, 26 L.Ed.2d 142 (1970). As his claim is well-pleaded, the burden rests upon the movant, Lovejoy, to refute the pleading allegations with sworn proof. *Herman v. National Broadcasting Co.*, 744 F.2d 604, 607 (7th Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 1393, 84 L.Ed.2d 782 (1985). Because Lovejoy has produced no evidence tending to preclude the possibility that its noncompliance with the Japanese exclusivity clause damaged O'Berto, summary judgment cannot be granted in its favor.

*Fenner Royalties Provision*

Lovejoy next challenges O'Berto's claims respecting the "Fenner royalties provision" of the Consulting Agreement. In his counterclaim, O'Berto asserts that, during the negotiations leading up to the Consulting Agreement, Lovejoy promised that it would include in the Fenner Agreement a provision whereby Fenner would agree to pay O'Berto a royalty of $20,000 per year for three years. O'Berto contends that Lovejoy's failure to provide for these royalty payments constitutes breach of contract and fraud. In support of these allegations, O'Berto offers five items of proof: (1) a preliminary draft of the Fenner Agreement containing the Fenner royalties provision; (2) sworn testimony that he was shown this draft and that he relied on it in entering the Consulting Agreement; (3) a first draft of the Consulting Agreement in which reference was made to O'Berto's third party rights under the Fenner Agreement; (4) O'Berto's deposition testimony that Pat Hennessy, a Lovejoy officer, told him that the Fenner royalties provision would be included in the Consulting Agreement; and (5) O'Berto's testimony that, when he asked Hennessy why the provision was not included in the final draft of the Consulting Agreement, Hennessy told him: "Don't worry about it, we will include it in the Lovejoy-Fenner contract [Fenner Agreement] as terms of a ... minimum royalty for the first three years." O'Berto Deposition of January 24, 1985 at 23.

Lovejoy asserts that each of these items of proof is barred by the parol evidence rule. Specifically, it urges the Court to take note of paragraph 19 of the Consulting Agreement, which provides that "[t]his Agreement represents the parties' entire understanding with respect to the subject matter hereof and supersedes all prior contracts, agreements, understandings and communications with respect to such subject matter." In Lovejoy's view, the Consulting Agreement is an integrated writing that may not be supplemented by extrinsic evidence.

■ We disagree. While Illinois courts follow the general rule that a writing complete on its face may not be varied or contradicted by evidence outside the writ-

ing, it is well settled that fraud in the inducement may be proved by extrinsic evidence. *Shanahan v. Schindler*, 63 Ill. App.3d 82, 94–95, 20 Ill.Dec. 239, 248–49, 379 N.E.2d 1307, 1316–17 (1978); *American Buyers Club v. Honecker*, 46 Ill. App.3d 252, 254, 5 Ill.Dec. 666, 667–68, 361 N.E.2d 1370, 1371–72 (1977). Fraud "goes to the very heart of the agreement itself," *Olin Corp. v. Aspinwall*, 384 F.Supp. 773 (N.D.Ill.1974), vitiating the mutual assent necessary to the creation of a valid contract.

The fact that the contract purports on its face to be a valid integration does not alter this result. *Caliber Partners, Ltd. v. Affeld*, 583 F.Supp. 1308, 1311–12 (N.D.Ill. 1984); Note, *Effect of a Merger Clause on the Parol Evidence Rule in Illinois*, 1954 U.Ill.L.F. 665, 674 (1954). Moreover, it is clear under Illinois law that an allegation of fraud in the inducement does not preclude the defrauded party from simultaneously pursuing an action for damages for breach of the contract. *Vance Pearson, Inc. v. Alexander*, 86 Ill.App.3d 1105, 1112, 42 Ill.Dec. 204, 209, 408 N.E.2d 782, 787 (1980); *Concord Indus. v. Harvel Indus.*, 122 Ill.App.3d 845, 850, 78 Ill.Dec. 898, 901, 462 N.E.2d 1252, 1255 (1984); *see also Havoco of America, Ltd. v. Hilco, Inc.*, 731 F.2d 1282, 1292 (7th Cir.1984) (applying Illinois law).

 As we discuss further later, O'Berto's claim is that Lovejoy, by making certain representations regarding exclusive marketing rights in Japan and royalties to be paid by Fenner, fraudulently induced O'Berto to enter the Consulting Agreement. Under Illinois law, it follows that O'Berto is entitled to submit parol evidence on this issue. Taking the items of proof submitted by O'Berto into consideration, it is obvious that a factual dispute remains as to whether Lovejoy was obligated to pro-

cure Fenner's agreement to pay O'Berto a royalty of $20,000 for three years. O'Berto swears that Lovejoy was so obligated; Lovejoy asserts that it was not. Such disputes are not amenable to summary adjudication.

*Fraudulent Misrepresentation*

O'Berto contends that Lovejoy's promises respecting Japanese marketing rights and royalties to be paid by Fenner were false misrepresentations that fraudulently induced him to enter the Consulting Agreement. Lovejoy argues in response that O'Berto cannot recover on his fraud claims because the alleged misrepresentations related to future conduct, not present conditions of fact.

As Lovejoy correctly observes, Illinois courts are reluctant to entertain actions for "promissory fraud." The general rule in Illinois is that a promise made without intent to perform it is not a misrepresentation. *Steinberg v. Chicago Medical School*, 69 Ill.2d 320, 334, 13 Ill.Dec. 699, 706, 371 N.E.2d 634, 641 (1977). A recognized exception exists, however, when the false promise is "alleged to be the scheme employed to accomplish the fraud." *Id.* at 334, 13 Ill.Dec. at 706, 371 N.E.2d at 641. Although the distinction between the general rule and its exception is not easily ascertained,[1] we are satisfied that it is the exception that controls the case before us.

A recent Illinois case employed the "scheme or device" exception to permit recovery on a substantially similar set of facts. In *Vance Pearson, Inc. v. Alexander*, 86 Ill.App.3d 1105, 42 Ill.Dec. 204, 408 N.E.2d 782 (1980), the defendant agreed to install a set of truck scales on the plaintiff's farm by a certain date. The work was not completed until many months later than promised. Alleging that the defendant knew or reasonably should have known

---

1. One court observed that "the exception tends to engulf and devour much of the general rule." *Vance Pearson, Inc. v. Alexander*, 86 Ill.App.3d 1105, 1112, 42 Ill.Dec. 204, 209, 408 N.E.2d 782, 787 (1980). *See generally* Pollele, *An Illinois Choice: Fossil Law or an Action for Promissory Fraud?*, 32 DePaul L.Rev. 565, 578–88 (1983).

that he would not be able to perform on time, the plaintiff sued for both breach of contract and fraud. The Illinois Appellate Court allowed recovery under both theories, stating:

> "[W]e deem the evidence sufficient for the trial court to have determined that the defendant made the promise of performance ... not intending to keep the promise but intending for plaintiff to rely on it to its detriment. If so, the false promise would have been an intended scheme to defraud plaintiff and would be actionable under the rule stated in *Steinberg* [69 Ill.2d 320, 13 Ill.Dec. 699, 371 N.E.2d 634 (1977)]."

86 Ill.App.3d at 1112, 42 Ill.Dec. at 209, 408 N.E.2d at 787. *See also Roda v. Berko*, 401 Ill. 335, 81 N.E.2d 912 (1948); *Concord Indus. v. Harvel Indus.*, 122 Ill.App.3d 845, 78 Ill.Dec. 898, 462 N.E.2d 1252 (1984).

In the instant case, O'Berto's theory is that Lovejoy promised to give O'Berto exclusive rights to market the HOHM 8081 in Japan, and promised to secure Fenner's agreement to pay O'Berto certain royalties, and that Lovejoy made these promises never intending to keep them. Rather, in O'Berto's view, Lovejoy made these promises for the sole purpose of inducing O'Berto to enter the Consulting Agreement. O'Berto emphasizes that the negotiations for the Consulting Agreement and the Fenner Agreement proceeded concurrently during the spring of 1980; thus, at the same time Lovejoy was promising O'Berto that he would have an exclusive right to market the HOHM 8081 in Japan, it was granting Fenner an apparently contradictory right.

■ On these facts, we cannot conclude that an Illinois court would refuse to hear O'Berto's case. To the contrary, we think it would find Lovejoy's alleged false promises to fall squarely within the "scheme or device" exception delineated in *Vance Pearson* and numerous other Illinois cases. In so finding, we of course express no view as to whether Lovejoy in fact made false promises or whether O'Berto relied on them to his detriment. These are questions that are not raised by the present motion and that, in any event, could not be resolved on the evidentiary record presented. We simply hold that the question of fraudulent misrepresentation remains in dispute, and that Lovejoy is not entitled to summary adjudication of this issue.

### Punitive Damages

■ O'Berto's prayer for punitive damages is predicated on the alleged acts of fraudulent misrepresentation discussed in the preceding section. Because we find that a genuine issue exists as to fraud, we also decline to prejudge the punitive damages claim. Until such time as it appears that O'Berto suffered no actual damages, recovery of punitives will remain in issue. *See Rhodes v. Uniroyal, Inc.*, 101 Ill. App.3d 328, 330–31, 56 Ill.Dec. 834, 836, 427 N.E.2d 1380, 1382 (1981) (punitive damages not allowed in absence of actual damages).

### Lovejoy's Nonpayment of Royalties

The next question is whether O'Berto is precluded, as a matter of law, from recovering for Lovejoy's nonpayment of certain royalties. The Consulting Agreement provided that Lovejoy was to pay royalties to O'Berto based on sales of the HOHM 8081, related technology, and products embodying the HOHM 8081. Consulting Agreement, ¶ 12(a)–(d). In his counterclaim, O'Berto alleges that Lovejoy failed to make these payments for a four-month period in 1982 and again in the months since July 1, 1983.

Lovejoy's rejoinder follows a now familiar pattern: it neither disputes nor concedes O'Berto's allegations, but argues that O'Berto's recovery is barred by a superseding principle of law. Lovejoy cites us to an Illinois case holding that one may

not sue for breach of contract unless he has substantially performed the contract or has a legal excuse for nonperformance. *Mueller & Sons, Inc. v. Northern Illinois Gas Co.*, 32 Ill.App.3d 249, 254, 336 N.E.2d 185, 189 (1975). Arguing that O'Berto breached the Consulting Agreement prior to the date of its alleged nonpayments, Lovejoy insists that O'Berto cannot recover on his claim.

In order to assess Lovejoy's argument, it will be necessary to set forth additional facts. In the Consulting Agreement, O'Berto promised to sell the HOHM 8081 to Lovejoy at his "actual direct cost of procurement." Consulting Agreement, ¶ 10. Until April, 1982, O'Berto had the chips manufactured by defendant International Microcircuits, Inc. ("I.M.I.") and sold the chip to Lovejoy at a price of $34.60. After that date, O'Berto arranged for I.M.I. to deliver the chip directly to Lovejoy at the same price. On February 29, 1984 (eight days after Lovejoy filed this lawsuit), O'Berto and I.M.I. executed a written agreement memorializing a prior oral agreement of April 16, 1982 ("I.M.I. Agreement").[2] Under this agreement, O'Berto conveyed all of his right, title and interest in the HOHM 8081 to I.M.I. I.M.I. Agreement, ¶ 1. I.M.I., in turn, promised to pay O'Berto a "minimum royalty" of $12.78 per HOHM 8081 sold until (1) five years from the date of the agreement, or (2) $50,000 in royalties was paid to O'Berto. *Id.* at ¶ 2. In addition, I.M.I. agreed to deliver all of Lovejoy's requirements of the chip "at a price not to exceed the price that [O'Berto] would have been required to pay had [O'Berto] continued to purchase these devices from [I.M.I.]." *Id.* at ¶ 3(a).

On its face, the I.M.I. Agreement does not conflict with O'Berto's duty to provide the chip to Lovejoy at his "direct cost of procurement." The agreement simply delegates the duty to I.M.I. The difficulty arises in determining O'Berto's "cost" once he conveyed the underlying technology to I.M.I. Documents produced by I.M.I. indicate that it sold the chips to O'Berto at a price of $21.82. This price applied to sales occuring both before and after April 16, 1982, the date at which the I.M.I. Agreement went into effect and the approximate date at which I.M.I. began shipping the chips directly to Lovejoy. Lovejoy, claiming that it had no knowledge of the I.M.I. Agreement until it deposed the president of I.M.I. in the course of this lawsuit, contends that the difference between the $34.60 price that it paid for the chip and the $21.82 paid by O'Berto represents a "secret profit" in violation of O'Berto's duty to provide the chip at his direct cost.

O'Berto takes issue with this characterization. He explains the $12.78 price differential as follows: (1) as to sales made after April 16, 1982, the differential represents O'Berto's "minimum royalties" under the I.M.I. Agreement. *See* I.M.I. Agreement, ¶ 2. The consideration for the transfer of the HOHM 8081 thus was satisfied, O'Berto maintains, through a price reduction to O'Berto on his purchases of the chip from I.M.I.; (2) as to sales made before April 16, 1982, the differential represents the amount credited to O'Berto for providing testing services on the technology.[3]

■ It should be obvious from our extended discussion above that significant

---

**2.** While the I.M.I. Agreement purports on its face to memorialize an agreement of April 16, 1980, the president of I.M.I. testified at his deposition that the correct date was April 16, 1982. Dep. of Frank Deverse, 4/3/85, at 22. Neither of the parties challenge this testimony in their briefs and we accept it as true.

**3.** In support of this contention, O'Berto cites us to the deposition testimony of Frank Deverse, who testified that, prior to 1982 when I.M.I. hired its own tester, O'Berto performed all testing on the HOHM 8081 and that the value of

these services was substantial in relation to the total cost of the chip. Dep. of Frank Deverse, 2/28/85, at 62–63. When asked whether this meant that the $12.78 price differential represented the value of O'Berto's testing services, Deverse responded, "Could be, yes. There was a value that he got for that and that could be the difference could be the value in the test." *Id.* at 63. Since we are obliged on a motion for summary judgment to draw any factual inferences in favor of the party opposing the motion, *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct.

factual disputes remain on this issue. Whether O'Berto's arrangement with I.M.I. constituted a breach of the Consulting Agreement turns upon whether the price reductions he received from I.M.I. are properly computed into the "cost" of the chip as that term is used in the Consulting Agreement. It seems to us unlikely that, when the parties entered the Consulting Agreement, they contemplated the possibility that the price at which O'Berto procured the manufacture of the HOHM 8081 might be adjusted to reflect the value of services rendered or property conveyed to a third party. In any event, the contract itself indicates no mutual understanding as to how O'Berto's "costs" are to be measured. Nor is it helpful to utilize, as the parties have, labels such as "kickback scheme" or "installment payments" to characterize the I.M.I. Agreement; these terms are mere conclusions that do not assist analysis.

■ In short, the clear, unambiguous record called for by summary judgment procedure is absent from this case. Such a record is indispensable in cases of contract interpretation. *Davis v. Chevy Chase Financial, Ltd.*, 667 F.2d 160, 170 (D.C.Cir. 1981) (summary judgment proper in contract case only when contract is "wholly unambiguous"); *Landtect Corp. v. State Mut. Life Assurance Co.*, 605 F.2d 75, 79–80 (3d Cir.1979) (same). *See also Cedillo v. Int'l Assoc. of Bridge & Structural Iron Workers*, 603 F.2d 7, 11 (7th Cir.1979) (questions of intent particularly inappropriate for summary adjudication).

*Lovejoy's "Attempt to Convert Ownership" of the HOHM 8081*

Finally, Lovejoy challenges Count I, ¶ 9(b) of O'Berto's amended counterclaim, which alleges that Lovejoy "in bad faith and without just cause attempted to convert the ownership of the HOHM 8081" in

violation of the Consulting Agreement and "prior agreements between the parties." Defendant-Counterplaintiff's Amended Counterclaim, Count I, ¶ 9(b). Although the pleading itself does not indicate the factual basis of this claim, the parties' subsequent submissions make clear that O'Berto is referring to an October, 1983 meeting between C.P. Hennessy, president of Lovejoy, and Frank Deverse, president of I.M.I. The only record we have of what transpired at that meeting is provided by Deverse's deposition testimony. He described the conversation as follows:

"He came to visit and we chatted generally ... and he told me that did I know that Lovejoy owned the rights to the 8081. I said that is not what I understand it and he said, 'Well, what do you understand?' I said 'Well, Gerry O'Berto came here and made a specific point out of the fact that he was having this chip integrated as Gerry O'Berto and he would pay for it himself and therefore per our business policy he would own the chip....

We chatted some more and he wanted to know whether I would, whether we could integrate a chip for him for Lovejoy like the one we were doing. I said 'Only if you produced the integration. The one we have which is owned by O'Berto I couldn't copy.' We talked some more and I think I suggested that he get in touch with a consultant."

Deposition of Frank Deverse, 2/28/85, at 54–55. O'Berto's objection to Hennessy's alleged representations appears to focus upon two statements in particular: (1) Hennessy's statement that Lovejoy owned the rights to the HOHM 8081; and (2) his statement that Lovejoy was interested in developing a new chip similar to the HOHM 8081. O'Berto maintains that these representations constituted a breach of the duty of good faith implied in all Illinois

993, 994, 8 L.Ed.2d 176 (1962); *Central Nat'l Life Ins. Co. v. Fidelity & Deposit Co.*, 626 F.2d 537, 539–40 (7th Cir.1980), we need not concern

ourselves here with the rather tentative nature of Deverse's testimony.

contracts. *See Martindell v. Lake Shore Nat'l Bank*, 15 Ill.2d 272, 286, 154 N.E.2d 683, 690 (1958).

A truly imaginative reading of Deverse's deposition transcript is required to support O'Berto's theory of wrongdoing (if theory it is at all). O'Berto offers such a reading when he suggests in his brief that Hennessy's alleged statements constituted an "attempt to induce I.M.I. to duplicate the circuitry involved in the technology for the benefit of Lovejoy." Defendant-Counterplaintiff's Mem. in Opposition to Motion for Summary Judgment at 6. Nevertheless, we are required on a motion for summary judgment to view the record in the light most favorable to the party opposing the motion. *Cedillo v. Int'l Assoc. of Bridge & Structural Iron Workers*, 603 F.2d 7, 11 (7th Cir.1979). We would be hesitant therefore to dispose of this claim simply on the basis of Deverse's testimony.

In this instance, however, Lovejoy has come forth with additional evidentiary material to back up its request for summary adjudication. The theory underlying these submissions is that O'Berto was not the owner of the HOHM 8081 on the date of the meeting in question.

As discussed earlier, the I.M.I. Agreement unambiguously provided for the sale by O'Berto to I.M.I. of the HOHM 8081. The transfer of ownership would appear to take place immediately under the terms of ¶ 1:

> "[O'Berto] hereby sells, assigns, and conveys to [I.M.I.], its successors and assigns, all of his right, titled [sic] and interest in and to the Technology, and specifically, a device known as an "HOHM: 8081...."

I.M.I. Agreement, ¶ 1. In the alternative, the agreement may reasonably be construed to provide for the transfer to take place only upon satisfaction of the consideration for the transfer. The consideration is set forth in ¶ 2, which provides:

> As considerations [sic] for the sale, [I.M.I.] will pay to [O'Berto] a minimum royalty of Twelve Dollars Seventy-Eight Cents ($12.78) on each unit of the [HOHM 8081] sold by it after the commencement date set forth above. [I.M.I.] guarantees a minimum of royalties payable to [O'Berto]:
>
> (a) over a period of five years from the commencement as set forth above, or
>
> (b) of Fifty Thousand Dollars which ever occurs first,
>
> with this Agreement continuing thereafter subject to termination thirty days written notice by either party to the other.

*Id.* at ¶ 2.

According to Lovejoy, it follows from these provisions that, by multiplying each chip sold by I.M.I. after April 16, 1982 by $12.78, one could determine when I.M.I. became the owner of the HOHM 8081. Frank Deverse, in his deposition, confirmed that this method would provide an accurate determination. Dep. of Frank Deverse, 4/3/85, at 22. Lovejoy's Exhibit C, consisting of excerpts from I.M.I.'s accounts receivable ledger, indicates that I.M.I. sold over 4000 chips between April 16, 1982 and August 18, 1982.[4] Since $12.78 multiplied by 4000 exceeds the minimum royalty of $50,000, Lovejoy concludes that I.M.I. became the owner of the chip no later than August 18, 1982.

O'Berto insists that a genuine issue remains as to whether the consideration for the transfer has been satisfied. He maintains that royalty payments were to continue beyond the $50,000 ceiling until either party terminated by thirty day notice, and that until such notice was given, ownership of the chip would not pass. *See* I.M.I. Agreement, ¶ 2. We find this to be an unreasonable construction of the contract's clear language. The provision to

---

**4.** The I.M.I. records contained in Lovejoy's Exhibit C show that Lovejoy paid for more than $160,000 worth of chips between April 16, 1982 and August 18, 1982. Since Lovejoy was paying $34.60 per chip, it would have received well over 4000 chips during this period.

which O'Berto refers merely negates any inference that the contract is to terminate automatically upon the satisfaction of the consideration. Even if I.M.I. were to continue to make payments or credits beyond $50,000 to O'Berto, there could be no question that its minimum obligations had been discharged and that the consideration therefore had been fulfilled. The favorable treatment we are required to accord parties against whom summary judgment motions are made does not extend to their patently implausible assertions. *Central Nat'l Life Ins. Co. v. Fidelity & Deposit Co.*, 626 F.2d 537, 539–40 (7th Cir.1980) (only "reasonable" inferences need be drawn in favor of non-movant); *see also Jason Winter's Herbaltea Ltd. v. Flemming Imports Corp.*, 494 F.Supp. 828, 830–31 (N.D.Ill. 1980).

■ We are satisfied that the ownership of the HOHM 8081 passed to I.M.I. no later than August 18, 1982. That being the case, O'Berto's allegation that Lovejoy "attempted to convert the ownership" of the chip from him in October 1983 has no meaning and no merit. Nor can any other breach of Lovejoy's obligation of good faith reasonably be perceived to have taken place at the October, 1983 meeting. In sum, no genuine issue of material fact exists as to Count I, ¶ 9(b) of O'Berto's counterclaim.

*"Partial Summary Judgment"*

■ The absence of a genuine issue as to one of several claims for relief does not, of course, entitle Lovejoy to judgment as a matter of law. Nevertheless, some relief is available. When summary judg-

ment is denied in whole or in part, Fed.R. Civ.P. 56(d) instructs the court to ascertain which facts remain disputed and which exist without substantial controversy.[5] Although this procedure is commonly referred to as a "partial summary judgment," it is really no more than a pretrial adjudication, interlocutory in character, specifying certain issues to be "deemed established" for trial. 6 J. Moore & J. Wicker, *Moore's Federal Practice* ¶ 56.20 (2d ed. 1948). Its purpose is to "salvage some results from the judicial effort involved in the denial of a motion for summary judgment," *Yale Transport Corp. v. Yellow Truck & Coach Mfg.*, 3 F.R.D. 440, 441 (S.D.N.Y.1944), and to "frame and narrow the triable issues if the court finds that such an order would be helpful to the progress of the litigation." *Capitol Records, Inc. v. Progress Record Distrib.*, 106 F.R.D. 25, 29 (N.D.Ill.1985); *see also SFM Corp. v. Sundstrand Corp.*, 102 F.R.D. 555, 558 (N.D.Ill.1984). Pursuant to the direction of Rule 56, the foregoing sections of this opinion have spelled out in some detail the areas in which substantial controversies persist. As to ¶ 9(b) of Count I, however, no dispute exists and an order will be entered granting Lovejoy "partial summary judgment" on this claim.

While we have salvaged perhaps little for our efforts in this instance—one claim disposed of out of many—we are confident that our order will further the progress of a heated litigation. Moreover, our findings on contested issues, while non-dispositive, can be expected to give direction to the parties in any subsequent proceedings in this case.

*Conclusion*

Summary judgment is denied as to O'Berto's fraud and punitive damages

---

**5.** The rule provides:

If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith contro-

verted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.
Fed.R.Civ.P. 56(d).

claims and his breach of contract claims relating to the Japanese exclusivity clause and Fenner royalties provision. "Partial summary judgment" is granted with respect to Count I, ¶ 9(b) of O'Berto's counterclaim.

An appropriate order will be entered.