Immacula ANTENOR, et al., Plaintiffs,

v.

D & S FARMS, Iori Farms, Inc., Virgil S. "Gil" Turke, a/k/a Virgil Banciu, and Ag–Tech Services, Inc., Defendants.

No. 90–0868–CIV.

United States District Court,
S.D. Florida.

July 31, 1994.

**1392**

Gregory S. Schell, Florida Rural Legal Services, Inc., Belle Glade, FL, for plaintiffs.

Monte B. Lake, McGuiness & Williams, Washington DC, David J. Stephany, Hogg, Allen, Norton & Blue, P.A., Tampa, FL, for defendants, D & S Farms and Iori Farms, Inc.

Virgil S. "Gil" Turke, pro se.

## ORDER AND MEMORANDUM OPINION

GRAHAM, District Judge.

THIS CAUSE came before the Court upon Defendant D & S Farms's Motion for Summary Judgment (D.E. 56), Defendant Iori Farms's Motion for Summary Judgment (D.E. 57) and Plaintiffs' Motion for Partial Summary Judgment (D.E. 61). For the reasons stated in the memorandum opinion below, United States Magistrate Judge William C. Turnoff's Report and Recommendation is hereby affirmed to the extent that it is consistent with the order herein.

## I. BACKGROUND

### A. Procedural History

On April 4, 1990, Plaintiffs filed a five count class action suit on behalf of 269 seasonal migrant farmworkers to redress and vindicate their rights under the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. §§ 1801, et seq. ("MSAWPA") and the Fair Labor Standards Act, 29 U.S.C. §§ 201, et seq., ("FLSA").[1] The Plaintiffs seek money damages, declaratory relief and injunctive relief on behalf of themselves and their fellow harvest workers for the Defendants': 1) failure to pay or ensure payment of Social Security (FICA) taxes and to issue and file appropriate W–2 and W–3 forms; 2) failure to pay or ensure payment of unemployment compensation (FUTA) taxes and to issue and file appropriate documents with the Florida Unemployment Compensation Bureau.[2]

On March 19, 1993, this Court granted Plaintiffs' motion to amend their class action complaint to add an additional 343 seasonal farmworkers as parties plaintiff in the instant case. On that same day, this Court issued an Order referring all dispositive and non-dispositive motions to United States Magistrate Judge William C. Turnoff, pursuant to 28 U.S.C. § 636 and the Magistrate Rules of the Local Rules of the Southern District of Florida.

On August 2, 1993, Defendant D & S Farms and Iori Farms filed motions for summary judgment on the limited issue of joint employment under the MSAWPA and FLSA.[3] On August 4, 1993, Plaintiffs also

---

1. The instant case was originally assigned to the Honorable Lenore Carrero Nesbitt but was subsequently reassigned to the undersigned on October 7, 1991.

2. Plaintiffs allege that because the appropriate forms and documents were not filed, they did not receive Social Security and unemployment compensation benefits based on their earnings while working for Defendants.

3. The Court and the Parties agreed that the issue of whether Defendants D & S Farms, Iori Farms, and Ag–Tech Services were joint employers should be decided first before addressing the merits of Plaintiffs' claims.

filed a motion for partial summary judgment on the issue of joint employment.

On August 26, 1993, this Court affirmed Magistrate Judge Turnoff's Report and Recommendation that this case be certified as a class action lawsuit consisting of all migrant and seasonal agricultural workers, as defined by MSAWPA, who were furnished to D & S Farms or Iori Farms, Inc. by Defendant Virgil S. Turke or Ag–Tech Services, Inc. during the 1985–86, 1986–87, 1987–88, or 1988–1989 bean harvests in South Dade County, Florida.

On October 25, 1993, Magistrate Judge Turnoff issued a Report and Recommendation recommending that both D & S Farms and Iori Farms' motions for summary judgment be granted and that Plaintiff's motion for partial summary judgment be denied on the grounds that Defendants D & S and Iori Farms were not joint employers of the Plaintiff farmworkers. Plaintiffs filed objections to the Report and Recommendation to which Defendants' filed a Joint Reply to the objections.

In addition to the objections and the reply to the objections, both Parties filed supplemental memoranda of law regarding the issue of joint employment. On January 13, 1994, this Court also held a hearing at which the Parties presented oral argument on the issue of joint employment. However, rather than rendering a decision without guidance from the Eleventh Circuit Court of Appeals on the issue of joint employment, this Court issued an Order deferring ruling on Magistrate Judge Turnoff's Report and Recommendation until after the Eleventh Circuit rendered a decision involving a similar pending case on the joint employment issue. On May 20, 1994, the Eleventh Circuit Court of Appeals rendered a decision in *Aimable v. Long and Scott Farms,* 20 F.3d 434 (11th Cir.1994) providing guidance as to the proper analytical framework for approaching joint employment issues involving the MSAWPA. Accordingly, using the *Aimable* decision as a framework, this Court is now prepared to decide whether to concur with Magistrate Judge Turnoff's Report and Recommendation.

## B. Material Facts

D & S Farms is a partnership which operates a large vegetable farm located in South Dade County, Florida. D & S Farms produces tomatoes, beans, and other vegetables for sale to produce markets throughout the country. During the 1985–86 harvest season, D & S Farms produced 1250 acres of tomatoes. Iori Farms is a Florida corporation also engaged in the operation of a vegetable farm in South Dade County, Florida. Iori Farms also principally produces tomatoes, harvesting approximately 1250 acres of tomatoes during the 1985–86 harvest season. Ag–Tech Services, Inc. ("Ag–Tech") is a Florida corporation formed by Virgil S. Turke in 1984 in response to a need to bring stability and order to the chaotic farm labor market during the mid–1980's.[4]

During the mid–1980's, both D & S Farms and Iori Farms ("Defendant Growers") began cultivating snap beans as an additional crop. However, Defendant Growers quickly discovered that they needed a different approach for the harvesting of its bean crops. Although Defendant Growers were satisfied with the organization and control of their tomato crews and tomato harvest workers, Defendant Growers were brand new to bean harvesting and immediately realized that many of the bean harvest workers were unreliable. Consequently, D & S Farms and Iori Farms, through recommendations from other south Dade County growers and local, state, and federal government officials, sought the services of Ag–Tech to provide a reliable labor source for harvesting their bean crops.

Ag–Tech contracted with D & S Farms and Iori Farms to provide harvest labor on a day-to-day basis for a set price based on the

---

4. Because of various economic factors, the labor market for bean pickers in the Homestead area had become quite disorganized and chaotic during the mid–1980's. Farmers had difficulty securing a reliable supply of labor to pick their highly-perishable bean crops and were often forced to pay premium prices to have their beans harvested. Virgil Turke established Ag–Tech Services, Inc. as an umbrella group to solve many of the farmer's labor problems.

amount picked.[5] Ag–Tech and the Defendant Growers negotiated a price of $3.90 per hamper of beans picked and delivered to the Growers' packing house facility.[6] Although both Defendant Growers had been paying their harvest workers 10 to 15 cents per hamper less, they felt that having a reputable and skilled harvest organization such as Ag–Tech handle the transportation, supervision, payroll accounting and administration for the bean harvest workers was worth the additional expense.

Since Ag–Tech entered into similar agreements with several other south Dade County growers, Ag–Tech was unable to supply all of the labor solely from its crew. Therefore, Ag–Tech hired dozens of other farm labor contractors to serve as subcontractors. Ag–Tech paid the subcontractors a portion of its fee from the growers, leaving the subcontractors responsible for the payment of wages to the individual harvest workers in their respective labor crews. The arrangements between Ag–Tech and the subcontractors were handled without any input from Defendant Growers.

From the $3.90 price per hamper, Defendant Growers retained approximately $0.11 for workers' compensation insurance for the harvest workers. Out of the remaining $3.79, Ag–Tech was responsible for paying the harvest workers' wages, the fees to subcontractors and its own operating expenses, including office clerical workers and field supervisors (called "fieldwalkers").[7]

The harvest workers were treated by Ag–Tech in many respects as "employees" in the common meaning of the term. For instance, Ag–Tech maintained payroll records and a database indicating each worker's name, address, social security number, and earnings. In some instances, Ag–Tech paid Social Security taxes on behalf of some of the subcontractors for the benefit of their workers.

Moreover, the payroll forms used for the workers were distributed by Ag–Tech and bore Ag–Tech's federal identification number and farm labor contractor's license number. Additionally, each worker was issued an identification badge indicating that the worker was an employee of Ag–Tech.

Ag–Tech also appeared to maintain daily control and supervision over the harvest workers in the field. Each day, Defendant Growers' farm managers gave Ag–Tech its assignments for harvesting beans that day. Normally, these assignments would consist of the assignment of a given number of rows of beans to harvest on the following day at a specific location designated by the farm managers. Ag–Tech would then hire sufficient subcontractors to pick the assigned rows of beans. Upon the arrival of the subcontractors' crews at the fields, Ag–Tech assigned each crew a portion of the field to pick. However, Defendant farm managers actually told the crews when they could begin picking the beans.[8] Once work began, the individual pickers placed the beans in hampers provided by the Defendant Growers. When a hamper was filled, the worker carried the hamper to a central area in the field, where one of Ag–Tech's employees weighed and sealed it.

Once sealed, the beans were stacked on pallets, provided by the Defendant Growers. This process continued until there were enough pallets to be transported to DiMare Homestead's packinghouse in vehicles provided by Defendant Growers. Ag–Tech, through its fieldwalkers, ensured that the picking process continued in an orderly manner by disciplining its workers when necessary. In certain circumstances, Ag–Tech would deliberately not choose to deal with certain subcontractors or workers.

Initially, Ag–Tech and Defendant Growers maintained a mutually satisfactory relation-

---

**5.** In addition to D & S Farms and Iori Farms, Ag–Tech contracted with at least nine other south Dade County growers to furnish labor to pick their entire bean crops for a set price.

**6.** Each full hamper weighs 32 pounds.

**7.** From the remaining $3.79, $2.50 paid for the harvest workers' wages, and $0.75 to $1.25 was used to pay the subcontractor. This arrange-

ment sometimes left Ag–Tech with as little as $0.04 per hamper to pay remaining administrative costs, leaving Ag–Tech with a very small profit margin.

**8.** Because picking beans wet with dew renders the produce commercially worthless, the farm managers took care to ensure that no picking occurred before the dew on the beans had dried.

ship. During the initial growing season (the 1985–86 season),[9] Ag–Tech's workers were assigned approximately 5 acres per day by D & S Farms and 10 to 15 acres per day by Iori Farms. By the following harvest season, D & S Farms increased its bean harvesting acreage to a size rivalling that of Iori Farms. This substantial acreage required Ag–Tech to furnish literally hundreds of workers per day.

By the 1987–88 harvest, Ag–Tech began experiencing an increasing number of problems. D & S Farms began mechanizing its bean harvest, thereby sharply reducing the amounts of beans available for Ag–Tech's workers to pick.[10] The trend toward mechanization continued for the remainder of Ag-tech's existence. Eventually, disputes arose over the Defendant Growers' use of their own crews to pick beans, reducing even more the amount of work available for Ag–Tech workers. Ag–Tech also began to find glaring discrepancies between the volume of beans its crews picked and the volume for which it received payment. Finally, a combination of reduced work, low profits, and enforcement by regulatory agencies caused Ag–Tech to cease business before the conclusion of the 1988–89 harvest season.

## II. DISCUSSION

### A. Standard of Review

 As a preliminary matter, a district court may grant summary judgment if the moving party shows that there is no genuine issue as to any material fact,[11] and it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Real Estate Financing v. Resolution Trust Corp.,* 950 F.2d 1540, 1543 (11th Cir.1992). The moving party bears the burden of demonstrating that there exists no genuine dispute as to any material factual issues. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

Moreover, in assessing the motions for summary judgment, the Court must review the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motions. *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1527–28 (11th Cir.1987).

 The non-moving party's burden, however, is not lessened by the movant's initial burden. Accordingly, once the movant has demonstrated that an essential element of the non-moving party's case is lacking, the non-moving party must offer proof sufficient to establish the existence of the essential element or else the district court will be required to grant the movant's motion for summary judgment. *Id.* at 1528; *Real Estate Financing,* 950 F.2d at 1543 citing *Celotex Corp.,* 477 U.S. at 321, 106 S.Ct. at 2552.[12]

 If the party moving for summary judgment relief does not meet its burden, the court can still enter an order granting partial summary judgment on the material facts which have no substantial controversy. Fed. R.Civ.P. 56(d).[13] Partial summary judgment

---

9. The bean harvest in the Homestead area generally extends from November through late April or early May.

10. Snap beans were traditionally hand-picked to minimize bruises and other cosmetic blemishes. However, by the late 1980's, technological advances eliminated the need for much of the hand-harvest labor. Through the use of a process known as hydrocooling, the blemishes caused by rough mechanical harvesting of beans could be largely eliminated, thereby removing the premium for hand-picking of the beans.

11. As to materiality, the substantive law will identify which facts are material. Only disputed facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

12. The purpose of Rule 56 is to allow for the prompt disposition of a case when there is no genuine issue as to any material fact. *See* Advisory Committee Notes to Rule 56. As stated in the Advisory Notes: "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."

13. Rule 56(d) provides:

(d) Case Not Fully Adjudicated on Motion. If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the

is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case. *Lovejoy Electronics, Inc. v. O'Berto,* 616 F.Supp. 1464, 1473 (N.D.Ill. 1985) citing 6 J. Moore & J. Wicker, *Moore's Federal Practice* § 56.20 (2d ed. 1948). This adjudication accelerates litigation by framing and narrowing the triable issues, and by eliminating, before trial, matters that contain no genuine issue of material fact. *See Lovejoy,* 616 F.Supp. at 1473.

### B. Legislative History

In 1983, Congress enacted the Migrant and Seasonal Agricultural Worker Protection Act "to remove the restraints on commerce caused by activities detrimental to migrant and seasonal agricultural workers ... and to assure necessary protections for migrant and seasonal agricultural workers...." 29 U.S.C. § 1801. Among its many provisions, MSAWPA required that agricultural employers register with the government, maintain certain employment records for migrant and seasonal agricultural, and comply with sundry housing, transportation, and compensation provisions. *See* 29 U.S.C. §§ 1811–1844. If an employer fails to adhere to any of the provisions in MSAWPA (as well as to any of the regulations promulgated pursuant to it), MSAWPA creates a private right of action in federal court on behalf of all aggrieved persons. The MSAWPA further empowers district courts to impose actual damages or statutory damages of $500.00 per plaintiff per violation. 29 U.S.C. §§ 1854(a) and (c).

The regulations promulgated under MSAWPA and FLSA define "joint employment" as follows:

> The term "joint employment" means a condition in which a single individual stands in the relation of an employee to two or more persons at the same time. A determination of whether the employment is to be considered joint employment depends upon all the facts in the particular case. If the facts establish that two or more persons are completely disassociated with the respect to the employment of a particular employee, a "joint employment" situation does not exist.

29 C.F.R. § 500.20(h)(4)(i).

### C. Economic Reality Test

■■■■ In order to determine whether a joint employment relationship exists, courts should look to the "economic reality" of all the circumstances concerning whether the putative employee is economically dependent upon the alleged employer. *Aimable v. Long and Scott Farms,* 20 F.3d 434, 439 (11th Cir.1994). In *Aimable,* the Eleventh Circuit identified five regulatory factors and six non-regulatory factors which a court could consider when looking at the "economic reality" of an employment relationship.[14] However, the Eleventh Circuit, in *Aimable,* held that the proper inquiry should be limited only to relevant and probative factors. *Id.* at 444. Accordingly, this Court shall examine the relevant and probative factors as outlined by the Eleventh Circuit and applied to the instant case to determine whether Ag–Tech and Defendant Growers are joint employers.

---

pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

**14.** Five of these regulatory factors are specifically outlined in the MSAWPA regulations: 1) the nature and degree of control of the workers; 2) the degree of supervision, direct or indirect, of the work; 3) the power to determine the pay rates or the methods of payment of the workers; 4) the right, directly or indirectly to hire, fire, or modify the employment conditions of the workers; and 5) preparation of payroll and the payment of wages. 29 C.F.R. § 500.20(h)(4)(ii) (1992). The remaining six factors are derived from various court decisions: 6) investment in equipment and facilities; 7) the opportunity for profit and loss; 8) permanency and exclusivity of employment; 9) the degree of skill required to perform the job; 10) ownership of property or facilities where work occurred; and 11) performance of a specialty job within the production line integral to the business. *Aimable v. Long and Scott Farms,* 20 F.3d 434, 439 (11th Cir. 1994).

### D. Relevant Probative Factors

The Court shall begin its analysis by examining the five regulatory factors which the Parties have conceded are relevant and probative to the determination of joint employment under the MSAWPA and FLSA.

#### 1. Regulatory Factors

##### i. Nature and Degree of Control of the Workers

In *Aimable*, the Eleventh Circuit stated that for a grower to be a joint employer, its control of the workers must go "beyond general instructions, such as how many acres to pick in a given day." *Id.* at 441. Instead, joint employer status requires that the grower has the ability to assign work to specific workers, or to take an overly active role in the oversight of the workers. *Id.* Such indicia of control are not present in the instant case.

Under the facts in this case, decisions such as whom and how many workers to hire and to whom to assign specific tasks were made exclusively by Ag–Tech. Although the Defendant Growers' farm managers gave Ag–Tech its daily assignment of which rows of beans to pick and when the workers could begin picking, the overall operational decisions were made by Ag–Tech. Ag–Tech decided how many harvest workers were brought to the fields, which harvest workers were hired, which harvest workers were directed to the Grower Defendants and which were directed to the other growers for whom Ag–Tech provided labor, and how many fieldwalkers were present to supervise the harvest workers. Based on the foregoing facts, the Court finds that Ag–Tech had ultimate control of the workers. Accordingly, this factor weighs heavily against a finding of joint employment.

##### ii. Degree of Supervision

In *Aimable*, the Eleventh Circuit rejected the argument that de minimis supervision of the harvest workers by farm employees is a sufficient showing of control of the workers to weigh in favor of a finding of joint employment. *Id.* at 441. The extent of the Defendant Growers' farm managers' supervision of the workers in the field was limited to directing where and when workers could begin picking, overseeing the distribution of empty hampers and the loading and transporting of filled hampers to the packinghouses for distribution to the market. On the other hand, Ag–Tech's fieldwalkers were responsible for the daily supervision over the harvest workers and disciplined the workers when necessary. Accordingly, this factor does not support a finding of joint employment.

##### iii. The Power to Determine Pay Rates or Methods of Payment

The power to determine the harvest worker's pay rates or method of payment rested squarely with Ag–Tech. Ag–Tech negotiated at arms' length a price of $3.90 per hamper of beans picked and delivered to the Growers' packinghouse facility. From the $3.90, after the Defendant Growers took out $0.11 for workers' compensation insurance, Ag–Tech independently determined how much to pay the harvest workers, and what commission rates to pay its subcontractors. The Eleventh Circuit, in *Aimable*, rejected the argument that the growers controlled the workers' pay rates by controlling the amount of work its farm labor contractor received. *Id.* at 442. Accordingly, the Court finds that the pay rates and methods of payment to the harvest workers were exclusively determined by Ag–Tech. This factor further supports a conclusion that the Grower Defendants were not joint employers of Ag–Tech's harvest workers.

##### iv. Right to Hire, Fire and Modify Employment Conditions

The rights to hire, fire and modify employment conditions were retained by Ag–Tech, and such rights were not shared concurrently with Defendant Growers' farm managers. When harvest workers jumped rows to harvest better quality bean plants, thus interfering with the orderly harvest, Ag–Tech disciplined the workers. Ag–Tech also controlled the assignment of subcontractors to particular fields and farms and would refuse to work with certain contractors with whom it had difficulty. Moreover, Ag–Tech furnished drinking water to its employees,

devised and administered a system for paying its employees. At no time did Defendant Growers mandate that a particular individual be hired or fired; shift a worker from one pay classification (hourly or piece-rate) to another; shift a worker from one task to another; or dictate the hours that any given employee could work. *See Id.* at 442. Accordingly, this Court finds that this factor does not support a finding of joint employment.

### v. Preparation of Payroll and Payment of Wages

■ The facts in the instant case clearly show that Ag–Tech exclusively controlled the preparation of its payroll and its payment of wages to harvest workers. The facts show that Ag–Tech: prepared its own payroll documents, exclusively retained payroll records on its harvest workers, developed a custom-made software program to help with the administration of its payroll system, wrote checks to its employees to pay for labor furnished to area farms, and retained social security deductions from the compensation paid to its employees. In fact, the only participation by Defendant Growers in the preparation of payroll and the payment of wages consisted of determining the appropriate social security contributions for the harvest workers, which was encouraged by local government officials. Such a minimal involvement in the preparation of Ag–Tech's payroll provides an additional factor weighing against a finding of joint employment.

In sum, all five regulatory factors support a finding that Defendant Growers were not joint employers of the Plaintiffs in this case. Accordingly, the Court turns its analysis to the non-regulatory factors stated by the Eleventh Circuit in *Aimable.*

### 2. The Non–Regulatory Factors

■ In analyzing the non-regulatory factors, the Eleventh Circuit cautions district courts when making joint employment determinations to closely scrutinize such non-regulatory factors to determine their relevancy in each particular situation. *Id.* at 444. Moreover, the Eleventh Circuit held that the proper inquiry should be limited only to those relevant and *"probative* factors." *Id.* Given

the direction by the Eleventh Circuit, the Court shall address each of the six non-regulatory factors.

### i. Investment in Equipment and Facilities

■ Plaintiffs argue that since Defendant Growers provided the trucks used to transport the beans, the hampers, the field toilets, and handwashing facilities used by the harvest workers while Ag–Tech provided no equipment or tools, this factor weighs in favor of finding joint employment. However, the Court finds that the factor of investment in equipment and facilities, although it may be relevant is some types of cases, is not probative of joint employment in the instant case.

Investment in equipment and facilities may be probative if the issue is whether the farm labor contractor is an independent contractor or an alleged employee. *Id.* at 443. In this case, Plaintiffs never allege that Ag–Tech was an employee of Defendant Growers. Rather, Plaintiffs allege that Ag–Tech and the Defendant Growers were joint employers. Moreover, Defendant Growers never allege that Plaintiffs were independent contractors. Accordingly, the Court finds this factor not probative of joint employment in the instant case.

### ii. Opportunity for Profit and Loss

■ The factor of opportunity for profit and loss does not address the issue of joint employment in cases when the farm labor contractor operates an independent business. *Id.* As noted above, since independent contractor status is not at issue in this case, the factor of opportunity for profit and loss is not relevant or probative of joint employment in the instant case.

### iii. Permanency and Exclusivity of Employment

■ Plaintiffs argue that during the relevant snap bean harvest seasons they worked exclusively for Ag–Tech and the Defendant Growers. Plaintiffs further argue that although Ag–Tech crews picked beans for other farms, the far majority of Ag–Tech's income came from Defendant Growers during

the relevant bean harvest seasons. However, as the Eleventh Circuit pointed out in *Aimable,* Plaintiffs' argument misses the point. Assuming that Plaintiffs primarily worked on Defendant Growers' farms, the facts suggest that Ag–Tech was Plaintiffs' *sole* employer because they worked exclusively and permanently for Ag–Tech during the relevant bean harvest seasons whether Ag–Tech crews worked on Defendant Growers' farms or other farms in South Dade County. *See Id.* at 444. Consequently, this factors fails to demonstrate that Defendant Growers were Plaintiffs' joint employer.

### iv. Degree of Skill Required to Perform the Job

 As was the case with the first three non-regulatory factors, the fourth factor does not assist in determining the ultimate legal issue of whether Ag–Tech and Defendant Growers were Plaintiffs' joint employers. Although the relative lack of skill required to harvest beans demonstrates that Plaintiffs were employees, it is not relevant or probative as to for whom Plaintiffs worked.

### v. Ownership of Facilities where the Work Occurred

Defendant Growers owned or leased the property on which Plaintiffs worked during the relevant harvest seasons. Accordingly, this factor supports the existence of a joint employment relationship.

### vi. Performance of a Specialty Job Integral to the Business

Plaintiffs performed a line-job integral to the harvesting of salable vegetables. Such harvesting was an integral part of Defendant Growers' business. Accordingly, this factor weighs in favor of a finding of joint employment.

### III. CONCLUSION

In conclusion, although two non-regulatory factors favor Plaintiffs, the Court finds that all five regulatory factors clearly demonstrate that Plaintiffs were not economically dependent upon Defendant Growers. Instead, the five regulatory factors and the non-regulatory factor of Permanency and Exclusivity of Employment indicate that Plaintiffs were solely dependent on Ag–Tech for their livelihood. Consequently, this Court finds that a Ag–Tech and Defendant Growers were not joint employers of Plaintiffs.

Accordingly, for the reasons set forth herein, it is **ORDERED AND ADJUDGED** that this Court concurs with United States Magistrate Judge William C. Turnoff's Report and Recommendation that D & S Farms's Motion for Summary Judgment (D.E. 56) and Iori Farms's Motion for Summary Judgment (D.E. 57) be GRANTED, and that Plaintiffs' Motion for Partial Summary Judgment be DENIED. Moreover, Plaintiffs' Objections thereto are OVERRULED and DENIED.

**DONE AND ORDERED.**